## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **WILLIAM T. LYONS JR.,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Case No.: SAG-20-02234** |
| **PNC BANK, N.A.,** | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff William Lyons ("Plaintiff") has brought this action against PNC Bank, N.A. ("PNC"), asserting claims for prohibited offset withdrawals made by PNC from Plaintiff's deposit accounts in violation of the Truth in Lending Act. ("TILA"). Three motions are currently pending before this Court. PNC has filed a dispositive motion which it characterizes as a Motion to Dismiss, or in the Alternative, for Summary Judgment. ECF 80. Plaintiff has filed a Cross-Motion for Partial Summary Judgment. ECF 86. The parties have filed their respective opposition and replies. ECF 86, 96, 102. Plaintiff has also filed a Motion for Class Certification. ECF 83. PNC opposed the motion, ECF 95, and Plaintiff filed a Reply. ECF 101. This Court has reviewed the filings and has determined that no hearing is necessary to resolve PNC's dispositive motion. *See* Loc. R. 105.6 (D. Md. 2025). However, this Court requires supplemental briefing on issues arising in the adjudication of the motion to certify. For the reasons explained below, PNC's Motion to Dismiss, or in the Alternative, for Summary Judgment, will be granted in part and denied in part, and Plaintiff's motion to certify and cross-motion for summary judgment will be held in abeyance pending the parties' submission of supplemental briefing.

# I.    FACTUAL BACKGROUND[1]

## A.    Plaintiff's Individual Claim

On February 4, 2005, Plaintiff obtained a HELOC from National City Bank.[2] The HELOC allowed for Plaintiff to draw on an open-end line of credit for a period of 10 years (ending on February 4, 2015), with a maximum amount of $149,650. ECF 80-3 at 2; 80-4 ¶ 8; ECF 81-2 ¶ 3. The HELOC was to be governed and construed in accordance with federal laws and regulations. ECF 80-3 at 4; ECF 81-2 ¶ 19. National City issued a credit card to Plaintiff to access his HELOC credit; PNC has represented that while Plaintiff primarily accessed his HELOC credit using cash advances and checks, he obtained $16,278.65 of HELOC credit by credit card between July 2005 and July 2006. ECF 80-1 at 9; ECF 80-5 (HELOC statements from August 2005 to July 2006). Plaintiff's last draw of any kind on the HELOC was in July, 2006, at which time Plaintiff had exceeded the $149,650 credit maximum. ECF 80-1 at 9; ECF 80-5 at 18; ECF 80-6 at 56:16–19.

---

[1] By the agreement of the parties (pursuant to Local Rule 105.2(c)), PNC filed its motion for summary judgment first. ECF 83 at 2 n.2. In that motion, it put forward a "Statement of Undisputed Facts." In his cross-motion and opposition, Plaintiff did not provide itemized responses to specific facts asserted in PNC's motion; rather, he generally asserted that "PNC's motion includes various 'statements of fact' that are not material to the claims before this Court," ECF 86-1 at 19–20—though also stating that "the underlying facts are largely undisputed," *Id.* at 6—and "generally incorporat[ing]" his Combined Statement of Material Facts in Support of His Motion for Class Certification and Motion for Partial Summary Judgment (ECF 81 (redacted) / ECF 82 (unredacted and filed under interim seal)), ECF 86-1 at 3 n.1. PNC then filed, with its opposition to Plaintiff's motion for partial summary judgment, a "Response to Named Plaintiff's Combined Statement of Material Facts," offering itemized responses. ECF 93 (redacted) / ECF 97 (unredacted and filed under interim seal). The below factual background, drawn from these filings, includes those material facts asserted by the parties that were not directly disputed by the opposing party.

[2] As evidence of this HELOC, PNC provides an "Equity Reserve Agreement" with a National City (Bank) header, ECF 80-3 (dated February 4, 2005), while Plaintiff states that the terms of his HELOC loan "are memorialized in part in a standard, uniform Deed of Trust," which he provides in support of his motion. ECF 81 at Lyons B; ECF 81-2 (dated February 4, 2005). Plaintiff has not disputed the authenticity of ECF 80-3; PNC, meanwhile, does not dispute that Plaintiff "executed a Deed of Trust to obtain his HELOC from National City" but asserts that "the material terms of the HELOC are set forth in the HELOC Agreement." ECF 93 at 1–2 (Response to Lyons B).

On November 6, 2009, National City Bank was merged into PNC, rendering PNC its successor in interest. ECF 80-1 at 8; ECF 81 at Lyons C; ECF 93 at 2 (Response to Lyons C). Plaintiff first opened a deposit account with PNC on May 3, 2010 (with account number ending 2553 ("Account 2553")). ECF 80-1 at 10; ECF 80-8 (signature card for Account 2553); ECF 81 at Lyons A n.2. He subsequently opened a second account with PNC on June 6, 2014 (with account number ending 6411 ("Account 6411")). ECF 80-1 at 10; ECF 80-9 (signature card for Account 6411). Neither of these accounts earned interest. ECF 80-1 at 11; ECF 86-1 at 7, 13 (acknowledging but not disputing PNC's assertion that the accounts were not interest-bearing).

Plaintiff has cited two offset withdrawals made by PNC as the bases for his cause of action, one occurring in September, 2019 and the other in February, 2020.  PNC states that, at the times of both offsets that are the subject of Plaintiff's action, his HELOC payment "was due both for the current month and for the preceding month." ECF 80-1 at 12 (citing ECF 80-4 (Declaration of Sarah Francis ("Francis Decl.") ¶¶ 13, 15). PNC asserts that Plaintiff "testified clearly and consistently that at no time did he ever dispute the amount of principal or interest that he owed to PNC under the HELOC." ECF 80-1 at 10 (citing ECF 80-6 (Transcript of May 28, 2025 deposition of William Lyons Jr. ("Pl. Dep.")) at 43:16–18, 78:8–9, 102:7, 128:11; ECF 80-4 (Francis Decl.) ¶ 9 ("PNC's records do not contain any indication that Plaintiff ever disputed any amount owed to PNC under the HELOC.")).

### 1.    The September 2019 offset withdrawal

A statement for Plaintiff's HELOC account "[f]or the period ending 09/04/2019" reflected a total amount due of $3,315.76, including a "Regular Monthly Payment" of $1,598.99 due for September, 2019 and a "Past Due Payment[]" of $1,396.97 for August, 2019. ECF 80-4 ¶ 13; 80-13; ECF 80-1 at 12. On September 26, 2019, PNC informed Plaintiff that, "as of September 26,

2019, we have exercised our right of offset" from Plaintiff's Account 2553, "in accordance with the terms of your deposit Account agreement." ECF 80-14; ECF 80-1 at 12.

Either on September 26 (as asserted by Plaintiff in his Combined Statement of Material Facts, ECF 81 at Lyons E), or September 27, 2019 (the date asserted by PNC in its Statement of Undisputed Material Facts, ECF 80-1 at 12),[3] PNC initiated an offset from Account 2553 in the amount of $1,396.97. ECF 80-11 (statement for Account 2553 reflecting a "check" for $1,396.97 paid on September 27, 2019); ECF 81 at Lyons E. However, Plaintiff made a payment on the HELOC on the same day. ECF 80-1 at 12. Plaintiff's Account 2553 did not have sufficient funds to cover Plaintiff's payment *and* the offset, so PNC reversed its September, 2019 offset and credited Plaintiff's Account 2553 with the $1,396.97. ECF 80-11 at 3 (statement for Account 2553 reflecting a "check" of $1,396.97 paid on September 27, 2019, and a deposit ("Reverse Check") of $1,396.97 dated September 30, but described as "[e]ffective 09-27-19"). PNC notified Plaintiff of this reversal in correspondence dated October 2, 2019. ECF 80-15. That PNC reversed the September 2019 offset withdrawal is not disputed, *see* ECF 86-2 (Declaration of William Lyons) ("Pl. Decl.") ¶ 5; however, while PNC asserts that it "immediately" returned the funds, ECF 80-1 at 12, it appears that the refunded money became available to Plaintiff three days later, on September 30, 2019. *See* ECF 80-11 at 2; ECF 80-6 at 145:4–8; ECF 86-2 ¶¶ 5–6. Thus, while PNC asserts that "Plaintiff never lost access to funds in his deposit account as a result of that

---

[3] The former date is indicated by PNC's September 26, 2019 correspondence with Plaintiff, ECF 80-14, and PNC's January 22, 2020 correspondence with Plaintiff, ECF 80-17 / ECF 81-4 at 2 ("Transaction dated September 26, 2019, in the amount of $1,396.97."), as well as the "pre-authorized debit check" attached thereto. ECF 80-17 at 14 (reflecting date of September 26, 2019). The latter date is indicated by the Declaration of Sarah Francis (a "Senior Default Litigation Specialist in Retail Lending Solutions at PNC") submitted with PNC's motion. ECF 80-4 (Francis Decl.) ¶ 14.

attempted offset," ECF 93 at 2 (Response to Lyons E), Plaintiff asserts that he "did not have access to that sum from September 27 – 30, 2019." ECF 86-2 ¶ 5.

On October 24, 2019, Plaintiff submitted a "Qualified Written Request" ("QWR") to PNC, requesting that PNC provide Plaintiff with, *inter alia*, all information and documents regarding the authorization on which PNC had relied for the September, 2019 offset transfer (as well as an offset dated February 28, 2019 that is not part of Plaintiff's TILA claim). ECF 80-16 at 2. While Plaintiff took issue with the transfers, he did not assert within the QWR that he did not owe the funds withdrawn by PNC. *Id.* In response, PNC indicated that its determination of authorization for the September 2019 offset was based on, *inter alia*, the Equity Reserve Agreement, its September 26, 2019 letter to Plaintiff, and a "pre-authorization debit check" not signed by Plaintiff. ECF 80-17 at 3, 4–8, 12–14; 81-4 at 3.

### 2.    The February 2020 offset withdrawal

A statement for Plaintiff's HELOC account "[f]or the period ending 02/04/2020" reflected a total amount due of $3,505.41, including a "Regular Monthly Payment" of $1,598.99 due for February, 2020 and a "Past Due Payment[]" of $1,598.99 for January, 2020. ECF 80-4 ¶ 15; 80-18; ECF 80-1 at 13. On or around February 26, 2020, PNC initiated another offset, this time from Account 6411, in the amount of $1,598.99.[4] On February 27, 2020, PNC informed Plaintiff that,

---

[4] Both the date and the amount of the February, 2020 offset withdrawal are reported inconsistently in the parties' briefings and exhibits. While the parties, in their briefings, do not appear to dispute the offset withdrawal was made on February 26, *see* ECF 80-1 at 13; ECF 81 at Lyons G; ECF 93 at 3 (Response to Lyons G), the statement for Account 6411 for the relevant period reflects a "check" for $1,589.99 paid on February 27, 2020, ECF 80-12 at 3, and the Francis Declaration states that PNC initiated the offset on February 20, 2020. ECF 80-4 ¶ 16. As for the amount, PNC, in responding to Plaintiff's Combined Statement of Material Facts, disputed Plaintiff's assertion that the amount of the February, 2020 offset withdrawal was $1,598.99; PNC stated that it was actually $1,589.99. ECF 93 at 3 (Response to Lyons G). However, this assertion, while supported by the Francis Declaration, ECF 80-4 ¶ 16, and the statement for Account 6411 for the relevant

"as of February 27, 2020, we have exercised our right of offset" from Plaintiff's Account 6411, "in accordance with the terms of your deposit Account agreement." ECF 80-19; ECF 80-1 at 13. According to PNC, just as was the case with the September, 2019 offset, Plaintiff initiated a payment on his HELOC on the same day of the February, 2020 withdrawal; PNC states, though without evidence in support, that this payment was in the amount of $2,075, and that the combined effect of Plaintiff's payment and the offset withdrawal was to "cover[] both the principal and interest that had been due for January and the principal, interest, and late fees due for February." ECF 80-1 at 14. Plaintiff paid off the HELOC on June 17, 2020. ECF 80-1 at 14; ECF 81 at Lyons A n.1.

### B.    PNC's Offset Process

PNC's Collections Department, managed by Anthony Hark, includes an "Offset Team" who reviews past-due loans to determine whether past-due payments can, in accordance with requirements set out in PNC's policies and procedures and applicable law, appropriately be recovered via offset against funds on deposit at PNC. ECF 81 at Lyons I, Lyons K; ECF 81-5 at 5–6; ECF 81-6 (Transcript of May 29, 2025 deposition of Anthony Hark ("Hark Dep.")) at 7:19–8:18, 15:4–9, 38:10–13; ECF 95-1 (Declaration of Anthony Hark, submitted with PNC's opposition to Plaintiff's motion to certify and incorporated by reference into PNC's responses to Plaintiff's Combined Statement of Material Facts ("Hark Decl.")) ¶¶ 2, 4–7; ECF 93 at 4 (Response to Lyons K). Each such review is performed by at least two members of the Offset Team. ECF 81 at Lyons N (citing Hark Dep. at 61:2–5); ECF 95-1 (Hark Decl.) ¶ 5. Offset Team members do not,

---

period, is contradicted by other exhibits submitted with, and expressly referenced within, PNC's motion. *See* ECF 80-18; ECF 80-19.

as part of this process, review any "loan deposit contract or agreement." ECF 81-6 (Hark Dep.) at 27:3–7; ECF 81 at Lyons N; ECF 93 at 4 (Response to Lyons N).

While Plaintiff has asserted that PNC "stated that HELOCs with a credit card associated could not be offset," ECF 81 at Lyons K (citing ECF 81-7 (filed under interim seal) at 4); PNC counters that, at the relevant time, it did not initiate offset for HELOC accounts for which a credit card was presently available for the borrower to access their credit, but "did not limit the possibility of offset" for HELOC accounts for which such a credit card was *not* presently available for that use, regardless of whether such a credit card may have been issued in the past. ECF 93 at 4 (Response to Lyons K). PNC has admitted that the September, 2019 and February, 2020 offsets from Plaintiff's deposit accounts "were not unusual." ECF 93 at 4 (Response to Lyons M).

## II.    ANALYSIS

### A.    PNC's Motion to Dismiss for Lack of Subject Matter Jurisdiction

In PNC's dispositive motion, which it has styled its motion as a "Motion to Dismiss, or in the Alternative, for Summary Judgment," PNC "asks the Court either to dismiss for lack of subject matter jurisdiction, or to grant summary judgment to PNC because Plaintiff cannot prove recoverable damages." ECF 96 at 18. PNC asserts that Plaintiff has not suffered a concrete injury and therefore lacks Article III standing (and consequently, that Plaintiff cannot represent any proposed class).[5] Because standing is a threshold jurisdictional requirement, this Court will address it first.

---

[5] Plaintiff argues that PNC could and should have raised its challenge to this Court's subject matter jurisdiction at an earlier point in this case; however, such challenges, "[u]nlike most arguments, . . . may be raised by a defendant at any point in the litigation." *Neal v. Pentagon Federal Credit Union*, No. ELH-18-451 2019 WL 4038564, at *17 n.10 (D. Md. Aug. 27, 2019) (quoting *Fort Bend County v. Davis*, 587 U.S. 541, 548 (2019) (internal quotation marks omitted)); *Pub. Int. Legal Found., Inc. v. Wooten*, -- F.4th --, 2026 WL 119879, at *2 (4th Cir. Jan. 16, 2026) ("Standing is a threshold requirement for jurisdiction that may be raised at any time.").

### 1.    Legal Standard

PNC seeks to dismiss Plaintiff's cause of action for lack of subject matter jurisdiction—specifically, for lack of standing, pursuant to Federal Rule of Civil Procedure 12(b)(1). ECF 80-1 at 14. Motions to dismiss for lack of subject matter jurisdiction are governed by Rule 12(b)(1) of the Federal Rules of Civil Procedure. While the Plaintiff bears the burden of proving that the court has jurisdiction over the claim or controversy at issue, a 12(b)(1) motion should only be granted if the "material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (quoting *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999)). In a motion to dismiss for lack of subject matter jurisdiction, the pleadings should be regarded as "mere evidence on the issue," and courts may "consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans*, 166 F. 3d at 647 (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F. 2d 765, 768 (4th Cir. 1991)).

### 2.    Discussion

Standing is a doctrine rooted in the traditional understanding of an Article III "case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("*Spokeo*"). Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

The burden is on the plaintiff to establish the three elements of standing. *Id.* (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). This remains Plaintiff's burden

notwithstanding his demand for class certification.[6] "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. . . ." *Lujan*, 504 U.S. at 561. Thus, "[i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)). *See also Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 300 (4th Cir. 2024) ("[A]t summary judgment, a plaintiff must demonstrate standing with evidence, not mere allegations or unsupported speculation.") (internal quotation marks omitted); *id.* at 295 ("Because [defendant] moved for summary judgment, [plaintiff] cannot rest on mere allegations but must set forth evidence which, viewed in his favor, would establish the elements of Article III standing."); *Neal*, 2019 WL 4038564, at *18 (noting "the stage of litigation is pertinent to the [standing] analysis," and where defendant challenged standing in its pre-discovery motion for summary judgment, "standing must be considered through 'the summary-judgment lens.'") (quoting *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019)).

PNC's motion challenges only the injury-in-fact component of standing. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 (internal

---

[6] *See Spokeo*, 578 U.S. at 338, n.6 ("[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured.") (internal quotation marks omitted); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) ("In a class action, we analyze standing based on the allegations of personal injury made by the named plaintiffs. . . . A putative class thus cannot establish Article III standing without a sufficient allegation of harm to the named plaintiff in particular.") (internal quotation marks and citations omitted).

quotation marks omitted)). Here, Plaintiff has asserted that PNC, without authorization, withdrew funds from his deposit accounts to offset his HELOC debt, in violation of the offset prohibition contained in 15 U.S.C. § 1666h, and that he was injured in that he lost his ability to use that money once it was withdrawn. Section 1666h—originally passed as Section 169 of the Fair Credit Billing Act of 1974 ("FCBA") (codified at Chapter 4 of TILA)—states:

> (a) A card issuer may not take any action to offset a cardholder's indebtedness arising in connection with a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer unless—
>
> (1) such action was previously authorized in writing by the cardholder in accordance with a credit plan whereby the cardholder agrees periodically to pay debts incurred in his open end credit account by permitting the card issuer periodically to deduct all or a portion of such debt from the cardholder's deposit account, and
>
> (2) such action with respect to any outstanding disputed amount not be taken by the card issuer upon request of the creditor.

15 U.S.C. § 1666h(a). The implementing regulation for this provision, entitled "Offsets by card issuer prohibited," states the "[g]eneral rule" that "[a] card issuer may not take any action, either before or after termination of credit card privileges, to offset a cardholder's indebtedness arising from a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer." 15 C.F.R. § 226.12(d)(1). Notably, it is an undisputed fact among the parties that PNC initiated offset withdrawals from Plaintiff's accounts in September, 2019 and February, 2020.

In challenging the sufficiency of the statutory violation asserted by Plaintiff as an injury for purposes of standing, PNC invokes *Spokeo* and *TransUnion, LLC v. Ramirez*, 594 U.S. 413 (2021), in which the Supreme Court clarified standing doctrine involving statutory causes of action. In *Spokeo*, the Court made clear that not every alleged statutory violation will

10

presumptively qualify as an injury-in-fact sufficient to support standing. The Court held that a plaintiff may not satisfy the strictures of Article III by alleging "a bare procedural violation." *Spokeo*, 578 U.S. at 341.

PNC's motion primarily argues that because the withdrawals it made from Plaintiff's accounts were to offset Plaintiff's outstanding debt on his HELOC account, that Plaintiff's claim is essentially challenging the *means* by which PNC obtained the money, a statutory violation "divorced from any concrete harm" and thus, a "bare procedural violation" of the kind *Spokeo* deemed insufficient. ECF 80-1 at 6; *see also id.* at 20 ("Plaintiff cannot identify a concrete injury . . . because PNC merely obtained a payment via offset that Plaintiff had been obligated for several weeks to make on his own."). Secondarily, PNC notes that the only harm which Plaintiff expressly alleged in his Complaint as "economic damages"—the "interest he would have earned from his deposit account" had the withdrawals not been made—was revealed, during discovery, to be a factual impossibility as neither of Plaintiff's deposit accounts were interest-bearing accounts. This, PNC argues, further demonstrates that "Plaintiff experienced no . . . detriment" from the offset withdrawals and that his "theory of injury . . . fails." ECF 80-1 at 6, 19.

In his Opposition, Plaintiff challenges PNC's characterization of its alleged violations as procedural, ECF 86-1 at 10–12 ("The TILA prohibition at issue is not a notice provision but a substantive, concrete provision . . . . Plaintiff was injured when PNC took his property."). With respect to PNC's argument regarding the lack of lost interest, Plaintiff has conceded that the accounts did not, in fact, bear interest; however, he argues that revelation does not negate the concrete injury he suffered in the form of the "loss of use" of the money that PNC withdrew from his accounts. This Court begins its standing analysis by assessing the nature of the harm associated with the alleged statutory violation, in itself; for this purpose, it is constructive to examine the

legislative purpose behind the offset provision, § 1666h. *See TransUnion*, 594 U.S. at 425 ("In determining whether a harm is sufficiently concrete to qualify as injury in fact . . . Congress's views may be instructive.") (internal quotation marks omitted).

Section 1601 of TILA makes clear the statute's goal of "assur[ing] a meaningful disclosure of credit terms . . . [to] avoid the uninformed use of credit," and indeed, courts routinely describe TILA's purpose as promoting disclosure. 15 U.S.C. § 1601. However, TILA, and its stated statutory purpose, have evolved through amendments effectuated by other legislation, including § 1666h. As the Fourth Circuit previously recognized in this case, the offset prohibition was added to TILA in 1974 as part of the FCBA, which amended TILA to "create[] *more* protections against 'inaccurate and unfair credit billing and credit card practices.'" *Lyons v. PNC Bank, N.A.*, 112 F.4th 267, 272 (4th Cir. 2024) ("*Lyons II*") (emphasis added) (quoting Pub. L. No. 93-495, 88 Stat. 1500 (1974)). The FCBA "[b]uil[t] on TILA's original goal[s]" of disclosure and informed use of credit and "aims to 'protect the consumer against inaccurate and unfair credit billing and credit card practices,'" an expansion of TILA's scope that is expressly captured in § 1601. *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 433 (3d Cir. 2018) (quoting 15 U.S.C. § 1601(a)). Certain legislative history of the FCBA confirms that the offset prohibition was intended "to strengthen the legal rights of customers who use credit cards issued by banks or other third parties." S. Rep. No. 93-278, at 3 (1973).[7]

---

[7] A violation of § 1666h is distinguishable from the statutory violation at issue in *Aikens v. Portfolio Recovery Assocs., LLC*, No. CV 16-1159, 2017 WL 5952696 (E.D.N.Y. Nov. 28, 2017). In *Aikens*, the court determined that a plaintiff lacked standing to assert a violation of the Electronic Funds Transfer Act ("EFTA") where she had orally authorized and agreed to defendant's monthly debits of her checking account to satisfy her outstanding debt to defendant. That practice had gone on for nearly a year, with defendant "not tak[ing] more money than was agreed to[,] [n]or . . . withdraw[ing] the money from any other account than that which Plaintiff authorized," *Id.* at *2, before plaintiff filed suit seeking money damages for defendant's alleged violation of a section of the EFTA that requires that "[a] preauthorized electronic fund transfer from a consumer's account

However, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *TransUnion*, 594 U.S. at 426. "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427. The Fourth Circuit has stated, applying *Spokeo*, that, "[c]ognizant that a statutory cause of action is not a replacement for a concrete injury, we recognize that a plaintiff suffers a concrete injury if she shows the harm stemming from the 'defendant's statutory violation is the type of harm Congress sought to prevent when it enacted the statute.'" *Baehr*, 953 F.3d at 253 (quoting *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240–41 (4th Cir. 2019) (internal citations and quotation marks omitted)).

Before delving further into the legislative history of the offset prohibition, it should be noted that there is wide recognition that banks hold a common law right of offset. During the drafting of the FCBA, offset of credit card debt against funds in a consumer's deposit account was noted as a "common practice." S. Rep. No. 93-278, at 9 (1973). In fact, in a federal court case decided during the drafting of the FCBA, adjudicating a challenge to the constitutionality of the exact offset practice at issue, the court stated—in *dicta*—that "[t]he right of setoff . . . is generally recognized throughout the United States. . . . Historically, the doctrine can be traced back to the Roman concept of 'compensatio.'" *Jojola v. Wells Fargo Bank*, No. No. C71-900-SAW, 1973 WL 158166, at *3 (N.D. Cal. May 2, 1973) (internal citations omitted). "Setoff is the logical and equitable result where debts are mutually due and owing; it is not a prejudgment 'remedy' in the

---

may be authorized by the consumer only in writing." 15 U.S.C. § 1693e(a). The EFTA provision at issue in *Aikens*—entitled "Preauthorized transfers"—specifically accounted for preauthorization of the transfers and merely prescribed that it be executed in a particular manner. TILA's offset prohibition, by contrast, specifically and categorically bars offsets by a card issuer, with cases of preauthorization providing an exception to this rule.

same sense as attachment, seizure of chattels, or repossession." *Id.* at \*4. *See also In re Wood*, 993 F.3d 245, 250 (4th Cir. 2021) (describing "the 'venerable' right of creditors, 'dating back to Roman and English law,' to set off debts they owe the debtor against the debts owed to them.") (quoting *In re De Laurentiis Entm't Grp., Inc.*, 963 F.2d 1269, 1277 (9th Cir. 1992)). A case previously decided in this Court, in adjudicating a claim brought under what it called the "blanket prohibition" on offsets contained in § 1666h, has also recognized that the right of setoff traditionally existed at common law. *Gardner v. Montgomery Cnty. Tchrs. Fed. Credit Union*, 864 F. Supp. 2d 410, 417 (D. Md. 2012) ("When a bank both holds a customer's funds on deposit and lends him money, the bank and the customer become mutual debtors. Therefore, at common law, banks are entitled to offset a debtor's defaulted loan against funds in his deposit account.").

In describing the purpose behind the proposed offset prohibition, Congress stated that funds in consumer's checking or savings accounts "can be attached without any recourse to the courts and in spite of any valid legal defense the cardholder may have against the bank"; thus, compared to other creditors who "would have to apply to a court before being permitted to attach funds in a borrowers' deposit account," banks which both issued cards and also had the cardholder's funds on deposit could "obtain a unique leverage over the consumer." S. Rep. No. 93-278, at 9 (1973); *see also* 117 Cong. Rec. S 965-969, 967 (daily ed. Feb. 8, 1971) (statement of Sen. William Proxmire) (the use of offset "permits the bank to obtain payment without any recourse to the courts. It permits the bank to collect a debt even though the consumer may have a legally valid reason for not paying. It nullifies whatever bargaining power the consumer might have by threatening to withhold payment in order to obtain satisfaction on a merchandise dispute.").

These statements indicate that, with § 1666h, Congress sought to protect consumers from harms resulting from a card issuer bank's exercise of its common law right of offset without the

bank entertaining any dispute or defense of the debt which the consumer might seek to raise. Here, the record reflects that Plaintiff has not disputed that he owed either of the amounts that PNC offset, nor has he alleged any defense regarding his delayed payment; he has challenged only whether those transfers were *authorized*. PNC asserts that "Plaintiff admits that he never disputed the amounts he owed to PNC on the HELOC." ECF 80-1 at 15. Plaintiff, both in his Complaint and at multiple points in his Opposition to PNC's motion, declines to expressly acknowledge that the HELOC payments were due. *See, e.g.*, ECF 3 ¶ 1 (referring to "payments allegedly due"); ECF 81 at Lyons E, Lyons G (referring to the offset amounts as "sums [PNC] *claimed* were owed on his HELOC loan.") (emphasis added); ECF 86-1 at 4 ("PNC utilized an unlawful method of collection . . . based upon its claims of sums owed"); *id.* at 7 ("PNC's argument . . . that the loss of use of money is not an injury in fact here because the money . . . was applied by PNC to a debt Lyons was obligated to pay according to PNC . . . is [not] based on any new facts or even disclosed in discovery . . . ."). However, the closest Plaintiff comes in his briefing to actually disputing he owed the money that PNC offset is in his Reply, where he asserts that (1) "[e]ven if PNC had the rights to offsets (it did not), offset go [sic] to the measure of damages, not the existence of an injury," ECF 102 at 2; and (2) "PNC arguments [sic] incorrectly assume that Lyons 'had no choice' but to pay PNC with those funds, ignoring that he . . . had the right to defer payment to PNC, to pay another creditor charging higher interest, or simply to retain his funds." *Id.* at 4.[8] The record

---

[8] In his Declaration, Plaintiff states, "To the extent PNC's current motion now claims it had a right to collect from me and offset any sums it claims I owed it related to my former HELOC loan, PNC represented in the land records for Frederick County, Maryland (Book 13879, Page 339), signed by PNC's Supervisor and Authorized Signer, that I owed nothing on my former HELOC Loan." ECF 86-2 (Pl. Decl.) ¶ 8. However, Plaintiff does not provide, does not identify the date of, and nowhere in his briefing specifically cites this document (at only one point in his Opposition to PNC's motion does Plaintiff cite to this *paragraph* of his Declaration, in support of his argument that PNC's challenge to standing is more accurately a counterclaim or defense that it has waived, *see* ECF 86-1 at 9 n.5. He cites to this paragraph at two other points for the same proposition, but

reflects that, both at the time of challenged offsets (as reflected by his QWR submitted shortly after the September, 2019 offset, ECF 80-16 at 2) and years later during discovery, Plaintiff did not dispute the underlying debt. *See* ECF 80-6 (Pl. Dep.) at 43: 16-18 ("Q: Okay. Did you ever dispute an interest charge? A: No."), 78:2-18 (Plaintiff, after being shown document reflecting $2,078.69 outstanding balance on HELOC as of September 12, 2019, stating, "I never disputed I owed the money," and, when asked if he was late in making a $1,598.99 payment due on September 1, 2019, responding, "I think I'd agree to that. Yeah, I'd agree. Okay. I agree with that."), 102:4-7 ("Q: And as of the February 26, 2020, do you dispute that you owed PNC at least $1,598.99 under the terms of the HELOC? A: I never disputed owing them any money."), 128:8-11 ("Q: . . . [A]ccording to this notice, do you dispute that as of February 12, 2019, you owed PNC $2,078.69? A: I've never disputed that I owed PNC money.").

Plaintiff's claim is predicated on the assertion that PNC initiated the offsets unilaterally, *without authorization*, not that his underlying debt was subject to dispute or defense. The mere lack of authorization is not the *harm* Congress sought to remedy, nor does it appear to have been recognized as a concrete harm. Plaintiff argues that the "collection bars" of 15 U.S.C. § 1666h(a) and 12 C.F.R. § 1026.12(d)(1) "are not contingent on whether there is a valid debt owed or not." ECF 86-1 at 10. He frequently cites to the holding of the Fourth Circuit, earlier in this case, stating that "TILA's offset provision, *which prevents creditors from dipping into consumer's deposit accounts in order to offset outstanding payments on their credit card plans*, applies to HELOCs." *Lyons II*, 112 F.4th at 270 (emphasis added). The Fourth Circuit's holding, however, only addressed

---

in support of his own cross-motion for summary judgment, *see id.* at 25 n.14, at 26). In addition, that the referenced land records purportedly reflect PNC's acknowledgement that he "owed nothing on [his] *former* HELOC loan" is not a sufficient basis for a reasonable inference, particularly in light of other evidence, that (1) Plaintiff did not owe a debt on his HELOC loan at the time of the offsets, and (2) Plaintiff disputed that debt.

the question of whether the statutory prohibition applied to HELOCs; it did not address the question, for purposes of standing, of whether a violation of that prohibition necessarily is a concrete harm. This Court agrees with Plaintiff that the statutory prohibition is not contingent on whether the debt that was offset is a valid debt. However, what *Spokeo* and *TransUnion* tell us is that a statutory prohibition does not, by definition, create a concrete harm. *See TransUnion*, 594 U.S. at 426–27 ("For standing purposes, . . . an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law."). Thus, the question is not whether the offset prohibition in § 1666h(a) is contingent on the existence of a valid debt, but rather, whether the concreteness of the injury asserted by a plaintiff alleging a violation of that prohibition is contingent on the existence of an undisputed debt. Based on the foregoing discussion, this Court concludes that a flat assertion of a violation of § 1666h, unaccompanied by any dispute of or defense to the debt underlying the challenged offset or allegations of any other type of harm resulting from the offset, constitutes merely a statutory harm.[9]

This Court stresses that it is not endorsing an assessment of injury under § 1666h in which, as Plaintiff characterizes PNC's argument, this Court is "adding" "an exception to the statutory prohibitions . . . if [the card issuer] claims there is a debt owed." ECF 86-1 at 10. PNC, or any other card issuer, is *not* "free to engage in offsets with immunity if *it alone* claims it is owed a debt" which a private plaintiff disputes. *Id.* The existence of a debt is a required element of the

---

[9] *Spokeo* and *TransUnion* further state that an inquiry into concreteness should "ask whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. at 424; *Fernandez*, 116 F.4th at 295 ("We evaluate whether an alleged injury is concrete by assessing whether it 'has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts.'") (quoting *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted)). While Plaintiff has not addressed that issue here, this Court notes that the bank's common law right of setoff would present a major hurdle for Plaintiff.

provision—indeed, for the basic concept of an offset—thus, for the provision even to apply, the card issuer *must* claim a debt is owed. If the cardholder alleges that the unilateral, unauthorized withdrawal deprived him of an opportunity to dispute, *inter alia*, the amount offset, or the validity of the claimed debt, or other recognized bases for a cause of action alleging that a creditor's exercise of its common law right of setoff was in fact wrongful, he likely will have clearly demonstrated an injury; not merely in light of the legislative purpose behind the provision, but in the form of a monetary harm that "obvious[ly]" "qualif[ies] as concrete." *TransUnion*, 594 U.S. at 425. However, this Court cannot conclude that this Plaintiff, claiming only a statutory violation of § 1666h, pertaining to debt which he has not disputed he owed nor asserted any defense to payment of, has demonstrated a concrete injury in fact for purposes of standing.[10]

However, that does not end the inquiry because Plaintiff has asserted another injury—the loss of use of the money withdrawn by PNC. Indeed, Plaintiff appears to have adopted this as his

---

[10] This Court separately notes that, even if it were to find the statutory violation alone a sufficient injury to confer standing, the fact that the offset funds were applied to Plaintiff's undisputed outstanding debt would lead it to conclude that Plaintiff suffered no actual damages from the violation. This District Court, and others, in assessing actual damages in similar circumstances— though pursuant to *state* consumer protection statutes—have stated that, in such circumstances, a plaintiff has not suffered actual damages. *See Allen v. Silverman Theologou, LLP*, No. JFM-14-3257, 2015 WL 2129698, at *8 (D. Md. May 6, 2015) (where plaintiffs' only claim for damages under the Maryland Consumer Debt Collection Act was for the amount of funds collected by the defendant, stating, "Even though Silverman may have unlawfully collected money in violation of the MCDCA, however, the money Golden paid does not constitute compensable 'actual damages.' Those payments were made on her concededly valid SECU debt, and there is no allegation that the money went elsewhere.") (citing *Willis v. Countrywide Home Loans Servicing, L.P.*, No. CCB-09-1455, 2009 WL 5206475, at *6 (D. Md. Dec. 23, 2009))); *Milam v. Selene Finance, LP*, No. 24 C 317, 2024 WL 3455027, at *6 (N.D. Ill. July 18, 2024) (Where plaintiff "does not contend she paid more than what she legally owed under the mortgage," and "[i]t is undisputed that Milam's payment to Selene Finance to avoid acceleration and foreclosure was money she contractually owed under her mortgage," plaintiff's "assertions constitute insufficient 'could haves' about how she would have used the money she legally owed but that she contends was not required to be paid *at that time* to avoid foreclosure and acceleration. The Court finds this allegation insufficient to plead actual damages [under the Illinois Consumer Fraud and Deceptive Business Practices Act].") (citing *Dieffenbach*, 887 F.3d at 830).

primary theory of injury, as evidenced by his Reply (in which he does not address the question of substantive versus "procedural" statutory injury), ECF 102, and his Declaration, which explicitly asserts that the offset withdrawals "injured [him] because it took away [his] ability (and others' ability) to use that money," ECF 86-2 ¶ 4, and asks that PNC pay "some sum of money for the loss of use of our money." *Id.* ¶ 7.

Nowhere in its Reply does PNC argue that "loss of use of money" cannot constitute an injury-in-fact; it argues only that certain cases cited by Plaintiff for that proposition are distinguishable in that (1) plaintiffs in those cases "were deprived of funds that they were not obligated to pay" (as PNC argues Plaintiff was obligated to pay the offset funds); and (2) those plaintiffs, unlike Plaintiff here, incurred additional harms (e.g., out-of-pocket expenses) as a result of the withdrawal. ECF 96 at 8–10.

This Court finds PNC's initial argument persuasive. It is notable that in not one of the cases cited by Plaintiff in support of his assertion of "loss of use of funds" injury were the plaintiffs asserting injury based on deprivations that were executed for the purpose of satisfying a debt owed by the plaintiff to the defendant. ECF 86-1 at 7–8, ECF 83-1 at 6–7. Rather, these cases and others analyzed by this Court uniformly involved deprivations of plaintiffs' monies by defendants, with delays in payment or reimbursement—and the consequent "loss of use"—of those monies being found to constitute concrete injuries sufficient for standing. *See, e.g.*, *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826 (7th Cir. 2018) (where plaintiffs alleged unauthorized charges by individual wrongdoers, the temporary loss of use of those funds while waiting for banks to reverse those charges was a concrete injury); *Van v. L.L.R., Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) (per curiam) (where defendant wrongfully charged plaintiff $530 in sales taxes and did not refund the charges until later, plaintiff had suffered an "actual, concrete, and particularized" injury in the loss

of the use of her money); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312 (11th Cir. 2019) (where medical service provider did not reimburse plaintiff for conditional payments made on behalf of Medicare beneficiaries for seven months, that delay, alone, is a "concrete" injury) ("For seven months, FHCP was unable to use money that (allegedly) belonged to it. The inability to have and use money to which a party is entitled is a concrete injury."). Here, PNC withdrew the funds from Plaintiff's deposit accounts for application to a past-due debt. In this way, the instant case is also distinguishable from *Ensminger v. Credit Law Center, LLC*, No. 19-cv-02147-TC-JPO, 2023 WL 6313680 (D. Kans. Sept. 28, 2023), where the court concluded that a plaintiff from whom the defendant had required advance payment (a month earlier than required) in violation of the Credit Repair Organizations Act had lost the time value of that money, "an economic harm [that is] precisely the type of injury long held to be the 'epitome' of concrete."

In light of the above, this Court cannot conclude that Plaintiff's assertion that the February, 2020 offset, applied to his undisputed outstanding HELOC debt and which was not returned to him, resulted in a concrete injury in his loss of use of that money. The September, 2019 offset, however, is distinguishable. In that instance, PNC has admitted that the September, 2019 offset, coupled with a HELOC payment made by Plaintiff from the same account on the same day, resulted in Plaintiff's account having insufficient funds, leading PNC to refund its withdrawal. PNC, in its dispositive motion, asserts that "Plaintiff does not dispute that PNC immediately reversed the September offset, which necessarily means that he never lost access to the relevant funds." ECF 80-1 at 15–16. However, Plaintiff *does* dispute this, explicitly, in his Declaration submitted in support of his Opposition. *See* ECF 86-2 (Pl. Decl.) ¶¶ 5–6 ("An earlier unauthorized withdrawal of $1,396.97 from my former PNC account was reversed after three days (so I did not have access to that sum from September 27–30, 2019)[,] [n]otwithstanding[] PNC's off-repeated [sic] claim

20

that it 'immediately' returned my monies to me . . . ."). Plaintiff's sworn statement would appear
to be corroborated by (1) Plaintiff's September, 2019 statement for his Account 2553 (submitted
with PNC's dispositive motion), which reflects that the refund check, while ostensibly "effective"
on the same day as the offset (September 27, 2019), was deposited in Plaintiff's account three days
later (September 30, 2019), ECF 80-11 at 2, and (2) by PNC's counsel, who appears to have
expressly acknowledged that Plaintiff was without a substantial sum of money—nearly $1,400—
for multiple days. ECF 80-6 (Pl. Dep.) at 145:4–8 ("Q: Looking at this statement, would you agree
that as of 'September 30, 2019,' you had access to the '1,396.97 reversal' that hit your account on
'September 27, 2019'? A: It appears to be, yes."). Accordingly, this Court concludes that Plaintiff
has sufficiently demonstrated that he lost the use of those funds, and was thus concretely injured
by PNC's September, 2019 offset initiated in alleged violation of § 1666h. Thus, he has standing
to bring his claim.[11]

---

[11] With respect to PNC's second argument regarding "loss of use of funds," namely, that a plaintiff
asserting this injury must show some *additional* harm *resulting* from the loss of use, this Court
notes that the issue appears to be subject to some debate in the federal courts. The Ninth Circuit,
in *Van*, rejected the proposition, endorsed in *Kawa Orthodontics, LLP v. Secretary, U.S. Dep't of
the Treasury*, 773 F.3d 243, 246 (11th Cir. 2014), that a plaintiff must further allege "specific plans
to invest its money into an interest-bearing asset," and referred to any lost interest income as "a
component of damages in connection with a temporary, wrongful deprivation of money." *Van*, 962
F.3d at 1164–65 & n.3. Multiple Second circuit courts have acknowledged a split on the
question. *See, e.g., Day v. Tractor Supply Co.*, No. 22-CV-489-JLS-MJR, 2022 WL 19078129, at
*3–4 (W.D.N.Y. Dec. 1, 2022) (post-*TransUnion*, following *Van* but compiling cases in
acknowledgment of dispute among Second Circuit district courts as to whether a plaintiff asserting
injury of loss of use of money in cases of delayed wage payments must also allege specific facts
regarding how they would have invested or otherwise used the money had it been timely paid),
*report and recommendation adopted*, No. 22-CV-489 (JLS) (MJR), 2023 WL 2560907 (W.D.N.Y.
Mar. 17, 2023); *Nunez v. Exec. Le Soleil New York LLC*, No. 22 Civ. 4262 (KPF), 2023 WL
3319613, at *3–5 (S.D.N.Y. May 9, 2023) (post-*TransUnion*, citing "[m]yriad cases, in this District
and others" (including *Van* and *Dieffenbach*), where concrete injury was found just in the
temporary deprivation of money, and acknowledging but rejecting differing authority as "outliers
in requiring more particularized allegations [that] are inconsistent with the familiar pleading
standard."). This Court finds the reasoning of *Van* persuasive, and concludes that Plaintiff need not
show additional harms flowing from the loss of use to demonstrate concrete injury.

To the extent PNC's dispositive motion was intended as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), it is denied.[12]

### B.    PNC's Motion for Summary Judgment

#### 1.    Legal Standard

Both parties seek summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. That rule provides that summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party

---

[12] PNC has not challenged Plaintiff's demonstration of the other elements of standing (causation and redressability), presumably because they are readily found here.

"must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted); *see also Kantsevoy v. LumenR LLC*, No. ELH-17-359, 2019 WL 1441982, at *6 (D. Md. Apr. 1, 2019). In considering each motion, the court should "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Rossignol*, 316 F.3d at 523). If the court finds that there is a genuine issue of material fact, both motions must be denied; but the court will render judgment if there is no genuine issue of material fact and "one or the other party is entitled to prevail as a matter of law." *Kantsevoy*, 2019 WL 1441982, at *6 (citation omitted).

### 2. Discussion

PNC's dispositive motion also seeks summary judgment "against Plaintiff on all claims in the Complaint," ECF 80-22 (Proposed Order), arguing that Plaintiff has no basis to recover either

actual or statutory damages *on an individual basis* pursuant to the TILA's civil liability provision (15 U.S.C. § 1640).[13] ECF 80-1 at 22–24. As a preliminary matter, Plaintiff has not suggested, in any discovery response or briefing, that he is seeking individual statutory damages. In his opposition to PNC's motion, Plaintiff pushes back on PNC's characterization of his interrogatory responses identifying his measures of damages, but does not put forward a coherent request for individual statutory damages. *See* ECF 86-1 at 18–19. Thus, this Court will grant summary judgment to PNC on this point. The question of Plaintiff's *actual* damages, however, requires some examination.

PNC argues that Plaintiff cannot recover actual damages because "there is no dispute that Plaintiff's deposit accounts did not earn interest. The legal rate of interest applicable to Plaintiff's deposit accounts was zero. This necessarily means that Plaintiff's actual damages are also zero." ECF 80-1 at 23. It further argues that its use of offset "provided Plaintiff with a tangible economic benefit" in that it "terminate[d] the accrual of interest that Plaintiff would otherwise have been obligated to pay" on the amount of the offset payment. *Id.*

Plaintiff counters by asserting that his (and the class members') actual damages stemming from the "loss of use of money" should be measured as "loss of use damages [from the time PNC seized the monies to when the monies were returned or a judgment is entered]." ECF 86 at 2 (brackets in original). More specifically, he argues for actual damages to be calculated by applying Maryland's legal rate of interest (6% per annum) to the sums taken via each individual offset, based on, in the case of the September, 2019 offset, the time between the offset and the refund, and, in the case of the February, 2020 offset, the time between the offset and judgment. *See* ECF

---

[13] The motion, while acknowledging that "TILA also provides a mechanism for determining statutory damages in class actions," § 1640(a)(2)(B), states that PNC "will address the class action cap as appropriate in response to Plaintiff's motion for class certification." ECF 80-1 at 22 n.10.

81 at Lyons AA n.41. He asserts, without support, that actual damages should be calculated using the "legal rate of interest" notwithstanding the fact that his deposit account did not, itself, bear interest. ECF 86-1 at 9; *see also* ECF 86-2 (Plaintiff's Decl.) ¶ 7 ("I believe it is fair and reasonable that PNC pay me, and others like me, some sum of money for the loss of use of our money based on no less than the legal rate of interest . . . .").

Assuming that this alternate theory of damages can be properly raised without prejudicing PNC,[14] this Court is not convinced that such damages have been shown or would be appropriate in the form sought by Plaintiff here. "Actual damages" "are traditionally defined as 'an amount awarded to the complainant to compensate for a proven injury or loss; damages that repay actual losses.'" *Wiley v. Portfolio Recovery Assocs., LLC*, 594 F. Supp. 3d 1127, 1138 (D. Minn. 2022) (quoting *Black's Law Dictionary*, Damages (11th ed. 2019)), *appeal dismissed*, 2022 WL 19730597 (8th Cir. May 6, 2022). Evidence of additional resultant harms is needed to establish actual damages resulting from a plaintiff's asserted "loss of use of money." To withstand PNC's request for summary judgment on this issue, Plaintiff must have produced sufficient admissible evidence to create a genuine dispute as to his actual damages resulting from the loss of use of the funds withdrawn for the September, 2019 offset. This Court cannot conclude that Plaintiff has met his burden.

Simply put, Plaintiff has not demonstrated any damages flowing from the loss of use of the withdrawn funds in September, 2019. He has not shown any other use to which the funds would

---

[14] PNC did expressly note, in its Reply, that the only type of damages that Plaintiff alleged in his Complaint and testified to at his deposition was the interest he would have earned from his deposit accounts, which Plaintiff has since conceded is zero. *See* ECF 96 at 11 (citing ECF 3 ¶ 29; ECF 96-1 at 25:1–6). However, Plaintiff indicated, in responses (given halfway through the discovery period) to PNC's first set of interrogatories, that his actual damages would include "[l]oss of use of the funds improperly withdrawn based on the applicable rate of prejudgment interest." ECF 80-20 at 1–2.

have been put in the days he was without them before the refund, nor has he asserted that, as a result of his having made payment to his HELOC credit in close proximity to PNC's offset, he effectively "double paid" any outstanding debt.

Moreover, this Court is not convinced that prejudgment interest is an appropriate measure of damages here where no other damages have been shown. "Prejudgment interest is viewed as a form of compensatory damage designed to place the plaintiff in the same position as if no violation had occurred." *Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*, 823 F. Supp. 2d 307, 324 (D. Md. 2011). Plaintiff has not provided any support for his assertion that he should be entitled to the legal rate of interest to compensate him for his loss of use of money notwithstanding the fact that the accounts in which the funds would have sat if not withdrawn did not bear interest.[15] While this Court appreciates Plaintiff's desire, after years of litigation, to ensure some form of compensation for PNC's allegedly unauthorized withdrawals, it is more properly the function of TILA's *statutory* damages provisions to provide plaintiffs relief where actual damages are small or non-existent. *See Vallies v. Sky Bank*, 583 F. Supp. 2d 687, 692 (W.D. Pa. 2008) ("Conceptually, . . . statutory and actual damages perform different functions: statutory damages are reserved for cases in which the damages caused by a violation are small or difficult to ascertain.") (quoting *Perrone v. Gen. Motors Acceptance Corp.*, 232 F.3d 433, 436 (5th Cir. 2000)), *aff'd*, 591 F.3d 152 (3d Cir. 2009). As noted above, Plaintiff has not sought, *individual* statutory damages under TILA for this violation, and, as discussed below, whether the class should be certified is an open question.

---

[15] While this Court acknowledges the Fourth Circuit's holding that "[t]he rate of pre-judgment interest for cases involving federal questions is a matter left to the discretion of the district court," *Hylind v. Xerox Corp.*, 481 F. App'x 819 (4th Cir. 2012) (unpublished per curiam) (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993) (en banc)), it is skeptical that this holding contemplates the district court deciding a rate of pre-judgment interest where the funds at issue were subject to an undisputed interest rate (in this case, zero).

However, this Court cannot endorse an unsupported theory of actual damages.[16] Therefore, it will grant summary judgment to PNC on the question of Plaintiff's individual *actual* damages as well.

This Court requires supplemental briefing from the parties as to the effect of its individual damages ruling on the viability of its motion to certify. But because Plaintiff's request for class action statutory damages may still be viable, this Court will begin to analyze some of the issues presented in that motion.

### C.    Plaintiff's Motion for Class Certification

#### 1.    Legal Standard

The "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Class actions are subject to Federal Rule of Civil Procedure 23(a), which requires that (1) the alleged class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the representatives' claims are typical of the claims of the class; and (4) the representatives will fairly and adequately protect the interests of the class. The party seeking certification carries the burden of demonstrating that it has complied with Rule 23. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). The four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequate representation—limit the class claims to those fairly encompassed by the named plaintiff's claims. *Dukes*, 564 U.S. at 349.

---

[16] Notably, the cases cited by Plaintiff in support of his request for pre-judgment interest as a measure of damages for "loss of use of money" concerned awards of back-pay after adverse employment actions. *See United States v. City of Warren, Mich.*, 138 F.3d 1083, 1096 (6th Cir. 1998); *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 83 (2d Cir. 1994).

After satisfying the Rule 23(a) prerequisites, the plaintiff must show that the proposed class action satisfies one of the enumerated conditions in Rule 23(b). *E.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Here, Plaintiffs seek class certification pursuant to Rule 23(b)(3). ECF 83. Under that rule, a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The ultimate decision to certify a class rests in this Court's discretion. *Boley v. Brown*, 10 F.3d 218, 223 (4th Cir. 1993). Courts evaluating class certification "must rigorously apply the requirements of Rule 23." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998). Although the court's analysis must be "rigorous" and "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Ct. Retirement Plans and Trust Funds*, 568 U.S. 455, 465–66 (2013) (citation omitted) (quoting *Dukes*, 564 U.S. at 351). The merits may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Id.* at 466.

### 2.    The Class Definition

Before assessing whether Plaintiff has satisfied his burden of compliance with Rule 23, this Court must first confirm the class definition upon which it will base that assessment. Plaintiff has, in his motion to certify, proposed a class definition materially modified from the definition originally pleaded in his Complaint. PNC challenges this modification on both procedural and factual bases, asserting, among other things, that Plaintiff's late modification would significantly expand the class and would prejudice Defendant, and that "[n]o discovery has been taken regarding

the expanded definition," ECF 95 at 12 n.5, meaning that Plaintiff "has provided no factual record to support a conclusion by this Court that certification of such a class is appropriate." *Id.* at 21. Plaintiff, meanwhile, challenges PNC's interpretation of Plaintiff's *pleaded* class definition as overly narrow, invoking the Fourth Circuit's previous rulings in this case. This Court will address these arguments in turn.

> Plaintiff originally requested that this Court certify a class consisting of:

> All persons who are residents of Maryland, Delaware, Virginia, West Virginia, and the District of Columbia who Defendant has made withdrawals from their deposit accounts for payment of a HELOC loan account originally established by National City in its Equity Reserve Agreement form in the one year preceding the filing of this Complaint.

ECF 3 ¶ 34. Plaintiff now proposes a class consisting of:

> All persons who are residents of Maryland, Delaware, Virginia, West Virginia, and the District of Columbia, from whom PNC made withdrawals from their deposit accounts for payment of a HELOC loan account in the one year preceding the filing of this Complaint to the date of certification.

ECF 83 at 2. Thus, Plaintiff has removed a key limiting parameter—that the class members' HELOC accounts were "originally established by National City in its Equity Reserve Agreement form." Plaintiff argues, and this Court recognizes, that "the flexibility involved in crafting a class definition" may warrant "deviation from the complaint at the class certification stage." *McMillan v. Kansas City Life Ins. Co.*, 762 F. Supp. 3d 443, 455 (D. Md. 2025). However, such deviation has its limits; those limits "reflect the principle that 'class definition is a tool of case management.'" *Douglas v. EF Inst. for Cultural Exch., Inc.*, No. 20-CV-11740-DJC, 2024 WL 3070251, at *4 (D. Mass. June 20, 2024). This Court rejects Plaintiff's assertion that his proposed modification results in a definition only "slightly differ[ent]" than the pleaded definition, ECF 83-1 at 15; to the contrary, it would expand it significantly, from (as discussed in more detail below) no more than

thirty members to a class of potentially hundreds.[17] To quote one of the cases cited by *Plaintiff* in support of his argument for modification, a class definition may be modified, after the close of discovery, when "none of the proposed changes will substantially change the contours of the class or unduly prejudice Defendants." *Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 267 (M.D. Fla. 2019). That is not the case here.

In arguing that his proposed modification should be permitted, Plaintiff cites primarily to *McMillan*, where the court allowed a modification to the class definition put forward in the plaintiff's motion to certify. However, the court in that case ultimately certified the class because, contrary to defendant's contention that the newly-proposed class was overly broad, the court found that "the change in the class definition did not alter the number of potential class members" and, thus, "[t]he certification motion's class definition is not broader than that of the amended complaint." *McMillan*, 762 F. Supp. 3d at 459. The question presented here, rather, is the propriety of a modification to a class definition, first proposed after the conclusion of discovery and in the context of Plaintiff's motion to certify, which would serve to *expand* the size of the class. In light of the prejudice to Defendants that would result from the timing and nature of the proposed modification, this Court concludes it is improper. While PNC's own interpretation of the pleaded class definition, discussed below, may have rested on incorrect interpretations of the Fourth Circuit's holdings in this litigation, PNC contends that, relying on the pleaded definition, it tailored

---

[17] In arguing the superiority of a class action in this case, Plaintiff refers to "tens or *hundreds* of separate lawsuits" that could be avoided through class certification. ECF 83-1 at 28 (emphasis added). *See also* ECF 101 at 6 ("[T]he exact number of members is more likely than not in the hundreds if not thousands of account holders." (citing ECF 81 at Lyons Q)); *id.* at 8 ("[D]epending on the final, approved definition by the Court, the size of the class is in the hundreds." (citing ECF 81 at Lyons Q)); ECF 81 at Lyons Q (Plaintiff asserting that "PNC's IT specialist" identified "more than 6,000 offset occurrences nationwide related to a HELOC loan by PNC.") (citing ECF 81-9 (Transcript of June 24, 2025 deposition of James Sabo ("Sabo Dep.") at 14:16–25, 18:15–24)).

its class research towards identifying and analyzing those borrowers whose HELOC loan accounts were originally established, as Plaintiff's was, with National City Bank. *See* ECF 95 at 11–16, ECF 95-2 (Supplemental Declaration of Sarah Francis ("Francis Supp. Decl.")).

At this juncture, with discovery already completed, for Plaintiff to be allowed to substantially expand the size of the class would unfairly prejudice PNC. Numerous courts have similarly held that the flexibility typically afforded for the refining of a class definition does not sanction such expansion. *See Walden v. Bank of New York Mellon Corp.*, No. 2:20-cv-01972-CBB, 2025 WL 2696463, at *4 (W.D. Pa. Sept. 22, 2025) (slip copy) ("[A] plaintiff is not prevented from redefining a putative class from what was originally pleaded to meet the needs of the case. . . . But, when a modified class definition seeks to expand, instead of narrow, the scope of a putative class by adding more putative class members, . . . courts may limit that practice where expansion would unfairly prejudice a defendant. . . . Courts have found defendants are unfairly prejudiced by an expanded class definition where it would result in a lack of notice to defendants regarding the nature and scope of the claims asserted, and where discovery has already been conducted.") (collecting cases); *Douglas*, 2024 WL 3070251, at *4 ("Although a plaintiff need not, at class certification, propose a class definition identical to the definition alleged in the operative complaint, courts may limit the extent to which a proposed class may be modified, particularly where the expansion of same would unfairly prejudice a defendant. For instance, some courts have held that a plaintiff may propose a new class definition as long as it is narrower than the class definition in the operative complaint. . . . In declining to permit broader class definitions, courts have reasoned that doing so would be unfairly prejudicial to defendants.") (collecting cases); *Vincent v. Money Store*, 304 F.R.D. 446, 453 (S.D.N.Y. 2015) ("While a district court may carve out a narrower class from an overbroad class proposed in the Complaint, . . . the plaintiffs cite no

case demonstrating the appropriateness of considerably expanding a class on a certification motion from what was originally proposed in the Complaint. . . . Expanding the class now on this motion [to certify] would be unfair to the defendants.").

Even where plaintiffs have (1) sought leave to amend (2) before the close of discovery—and, notably, neither circumstance exists here—courts have declined to endorse a revised class definition that would *expand* the size of the class to defendants' prejudice. *See Ramnarine v. Rainbow Child Dev. Ctr., Inc.*, No. RWT 17-2261, 2018 WL 1243546, at *2 (D. Md. Mar. 9, 2018) (denying requested leave to amend class definition to add categories of employees because the addition "would in effect expand the clearly-stated narrow scope identified in the Amended Complaint in a significant way, thereby forcing the Defendants to defend against a whole new set of facts of which they had no notice" until plaintiff's motion for leave to amend. "To do so, moreover, at such a late hour when discovery is supposed to be winding down would only exacerbate the prejudicial impact on the Defendants. The parties have already completed a significant amount of discovery, including the production of written discovery responses and the deposition of key witnesses. . . . The proposed amendments would require the Defendants to incur additional expenses and expend resources in order to address the new set of facts related to each new employee category. To permit the amendments, then, would result in prejudice to the Defendants."); *In re Boeing Co. Sec. Litig.*, No. 1:24-cv-151 (LMB/LRV), 2025 WL 2428481, at *2 (E.D. Va. Mar. 7, 2025) (slip copy) ("Many of the cases that plaintiffs cite for the proposition that courts can change the class size at the class certification stage involve narrowing, not expanding, the size of the class. . . . To allow plaintiffs to enlarge the class at this juncture would prejudice defendants and unduly complicate the litigation while the parties are in the midst of extensive discovery and are headed to mediation next month.").

Perhaps in anticipation of a challenge from PNC to his newly-proposed class definition, Plaintiff preemptively argued that "any feigned prejudice presented by PNC is simply self-serving and self-inflicted" because PNC "did not disclose its standard conduct was the same for all HELOC loans until weeks ago." ECF 83-1 at 16–17.[18] In his Reply, Plaintiff argues that PNC would not be prejudiced by the more expansive class definition because "PNC had full notice since 2020 that the class concerns borrowers from whom PNC offset deposit accounts to collect HELOC payments—regardless of the original lender—because all such HELOCs were serviced under PNC's uniform policies." ECF 101 at 6. He later argues (within his discussion of class numerosity) that, "[b]ased on PNC's uniform practice and conduct, limiting the class to 'National City' borrowers would artificially exclude consumers subjected to identical conduct." *Id.* at 7. This Court cannot agree with either argument. Addressing the latter argument first, limiting the class to borrowers who had a "HELOC loan account originally established by National City in its Equity Reserve Agreement form" is not an "artificial" restriction; it is drawn directly from Plaintiff's pleaded class definition. ECF 3 ¶ 34. Second, even assuming that PNC applied a uniform offset policy to all HELOCs, that does not mean it had "full notice" that the class *Plaintiff sought to represent* concerned borrowers "regardless of the original lender."

---

[18] In his Combined Statement of Material Facts, Plaintiff has stated that PNC produced certain internal policies concerning offsets to Plaintiff on May 29, 2025, *see* ECF 81 at 4 n.14 (describing ECF 81-7 and ECF 81-8 (both filed under interim seal)); Plaintiff suggests that his expanded definition is directly connected to information gleaned from these policies. However, Plaintiff does not explain why, rather than seeking leave to amend his Complaint upon discovering such information, he instead waited more than two months to first propose a new, expanded class definition in his motion for class certification, on August 8, 2025. *See Vincent*, 304 F.R.D. at 453 (stating it would be "improper" and "unfair" to adopt new, expanded class definition offered by plaintiffs in their motion to certify where discovery had already been completed with the scope of the class as defined in an earlier version of the complaint, and plaintiffs had made no further attempt to amend their complaint nor offered any explanation for expanding the class definition without any such attempt).

Based on the above, this Court declines to adopt the expanded class definition first raised by Plaintiff in his motion to certify. However, this does not entirely resolve the class definition issue, as the scope of Plaintiff's *originally* pleaded definition is, itself, disputed. From Plaintiff's pleaded class definition, PNC articulates "four principal criteria for class membership":

> (a) residence in one of the five specified jurisdictions; (b) status as a borrower on a HELOC obtained from National City and memorialized by the Equity Reserve Agreement; (c) occurrence of an offset initiated by PNC to recover a delinquent payment via funds held in a PNC deposit account; and [d] occurrence of the offset(s) within the one year prior to filing of the lawsuit.

ECF 95 at 12. However, PNC asserts that the Fourth Circuit's holding in *Lyons II* dictates that a borrower must have actually *used* a credit card to access their HELOC account in order for the HELOC to constitute a "credit card plan" falling under the ambit of § 1666h. Thus, it argues this as an additional necessary criteria for class membership. *Id.* at 16 (stating that the Fourth Circuit determined that the term "credit card plan" may include HELOCs, "but only in instances where a consumer has accessed their HELOC via a credit card."), 17 (requesting that this Court "consider only whether a class can be certified of HELOC borrowers who satisfy the stated criteria and accessed their HELOC via credit card.").

It is true that the Fourth Circuit appeared to indicate at multiple points in its opinion that the *use* of a credit card to access HELOC credit is key to bringing HELOCs under the protection of the offset prohibition of § 1666h. *See Lyons II*, 112 F.4th at 274 ("What matters is that a card *is used* to access the credit and that terms and conditions govern the credit.") (emphasis added); *id.* at 278 ("We therefore hold that 'credit card plan' includes HELOCs where credit *is* accessed via a credit card.") (emphasis added). However, its opinion was inconsistent: it also stated that "[w]hat is relevant to whether something is a 'credit card plan' is not whether it is home-secured credit, but instead whether it *involves* a specific access device, *i.e.*, a credit card." *Id.* at 278 (emphasis

added).[19] In addition, contrary to PNC's assertion that the Fourth Circuit based its holding, in part,

on the fact that "[t]he record before the Court showed that Plaintiff had accessed his HELOC credit,

in part, by using a credit card issued by National City," ECF 95 at 17, the Fourth Circuit, in fact,

never explicitly mentioned Plaintiff's *use* of the card. Rather, the Fourth Circuit, in its statement

of facts, noted that National City Bank had "*issued* Lyons a credit card that he *could use* to obtain

cash advances or to make purchases using HELOC loan funds." *Lyons II*, 112 F.4th at 271 (internal

quotation marks omitted) (emphasis added).

In seeking to clarify the Fourth Circuit's holding, this Court has consulted guidance

promulgated by the CFPB. Notably, in its "Official Interpretation[]" of § 1026.12(d)(1)—the

regulatory provision implementing the offset prohibition in § 1666h—CFPB stated that the offset

prohibition:

> applies to any indebtedness arising from transactions under a credit card plan,
> including accrued finance charges and other charges on the account. The
> prohibition *also applies to balances arising from transactions not using the credit*
> *card itself but taking place under plans that involve credit cards*. For example, if
> the consumer writes a check that accesses an overdraft line of credit, the resulting
> indebtedness is subject to the offset prohibition since it is incurred through a credit
> card plan, even though the consumer did not use an associated check guarantee or
> debit card.

12 C.F.R. Pt. 1026, Supp. I, Par 1, Comment 12(d)(1) (emphasis added). Considering this "Official

Interpretation[]," it is unsurprising, then, that the CFPB argued (according to the Fourth Circuit)

in its amicus brief filed in *Lyons II* that the term "credit card plan" "includes HELOCs when a

consumer has been *issued* a card." *Lyons II*, 112 F.4th at 273 (emphasis added). This Court assumes

---

[19] It appears that Senior Circuit Judge Floyd, writing in dissent of the Fourth Circuit's holding regarding Plaintiff's TILA claim, understood this to be the majority holding: "The majority's interpretation expands the term 'credit card plan' in the offset provision to include any HELOC that *can be accessed* via a credit card. . . . Under the majority's reasoning, a HELOC that came with a credit card is covered by the offset provision, but a HELOC accessed by other means is not." *Lyons II*, 112 F.4th at 280–81 (Floyd, J., dissenting in part) (emphasis added).

that the Fourth Circuit's holding required that, for a HELOC to qualify as a "credit card plan" under § 1666h, the HELOC policy-holder must, at minimum, have been *issued* a card with which they had the *ability* to access their HELOC credit. This Court returns, then, to the question of whether the card had to be used. Notably, § 1666h (and its implementing regulation, § 1026.12(d)(1)) refer to the parties to the relevant credit card plan as the "card issuer" and the "cardholder." Using the emphasis added by *PNC* in its opposition to Plaintiff's motion to certify, the statutory offset prohibition states: "A <u>card issuer</u> may not take any action to offset a <u>cardholder's</u> indebtedness arising in connection with a consumer credit transaction under the relevant <u>credit card plan</u> against funds of the <u>cardholder</u> held on deposit with the <u>card issuer</u>[.]" ECF 95 at 16 (quoting § 1666h) (emphasis in ECF 95).

The TILA defines "card issuer" as "any person who issues a credit card, or the agent of such person with respect to such card." 15 U.S.C. § 1602(o). The statute defines "cardholder" as "any person *to whom a credit card is issued* or any person who has agreed with the card issuer to pay obligations arising from the issuance of a credit card to another person." § 1602(n) (emphasis added). Note that both prongs of the definition of "cardholder" only contemplate the *issuance* of a credit card, rather than the *use* of that card. Further, the statute's definition of "credit card" is "any card, plate, coupon book or other credit device *existing for the purpose* of obtaining money, property, labor, or services on credit." § 1602(l).[20] Again, the statute does not appear to require,

---

[20] Review of the corresponding definitions in Regulation Z reveals no material differences. *See* 12 C.F.R. 1026.2(a)(7) (defining "card issuer" as "a person that issues a credit card or that person's agent with respect to the card"); 12 C.F.R. 1026.12(a)(8) (defining "cardholder" as "a natural person to whom a credit card is issued for consumer credit purposes, or a natural person who has agreed with the card issuer to pay consumer credit obligations arising from the issuance of a credit card to another natural person"); 12 C.F.R. 1026.2(a)(15)(i) (defining "credit card" as "any card, plate, or other single credit device that *may be used from time to time* to obtain credit.") (emphasis added).

for such a credit device to qualify as a credit card, that the device be actually *used* to obtain those items on credit, it requires only that the device exist for that purpose.

Based on the above, this Court does not agree with PNC's restrictive interpretation of the Fourth Circuit's holding in this case regarding what circumstances will render a HELOC a "credit card plan" subject to the offset prohibition. Rather than applying only to those borrowers who *used* a credit card to access their HELOC credit,[21] this Court concludes that, where a credit card was issued to a consumer in association with a HELOC account and was thus an available means by which that consumer could access their HELOC credit, that HELOC constitutes a "credit card plan" subject to the offset prohibition of § 1666h. From this conclusion, this Court adopts the following class definition, modeled after Plaintiff's originally pleaded definition but with alterations to account for this Court's holding and otherwise for clarity:

> All persons who are residents of Maryland, Delaware, Virginia, West Virginia, and the District of Columbia who established a HELOC loan account with National City Bank by its Equity Reserve Agreement form, who were issued a credit card for purposes of accessing that HELOC account, and from whose deposit accounts Defendant has made withdrawals for payment of debt in that HELOC account in the one year preceding the filing of the Complaint.

---

[21] PNC has also asserted that "[i]f a HELOC had moved into the Repayment Period, then draw privileges had terminated. This necessarily meant that the borrower did not have a credit card to access the HELOC. Prior to March, 2020, PNC treated such HELOCs as eligible for offset." ECF 95 at 11 n.4 (citing Ex. 1, Hark Decl. ¶ 10). To the extent PNC makes this assertion to suggest that once a cardholder's ability to use a credit card to access their HELOC credit had terminated, the plan was no longer a "credit card plan," and PNC could execute an offset, it is contradicted by the plain text of the relevant regulation: "A card issuer may not take any action, *either before or after termination of credit card privileges*, to offset a cardholder's indebtedness . . . ." 12 C.F.R. § 1026.12(d)(1) (emphasis added). *See also* ECF 83-1 at 4 (citing § 1026.12(d)(1) with same emphasis); 12 C.F.R. Pt. 1026, Supp. I, Comment 12(d)(1) (CFPB Official Interpretation stating that "[t]he offset prohibition applies even after the card issuer terminates the cardholder's credit card privileges, if the indebtedness was incurred prior to termination. If the indebtedness was incurred after termination, the prohibition does not apply.").

*See Cox v. Shah*, 187 F.3d 629, 1999 WL 492664, at *7 (4th Cir. July 13, 1999) (unpublished per curiam) ("Rule 23(c)(1) of the Federal Rules of Civil Procedure provides that a district court may alter or amend the class 'before the decision on the merits.'"). Having adopted a definition differing from those which the parties operated from in their briefing of the motion to certify, this Court thinks it would be improper to adjudicate Plaintiff's motion to certify without first affording the parties an opportunity to brief the issue of certification with the benefit of the conclusions reached by this Court herein, as those conclusions will undoubtedly be of consequence for the requisite factors for certification. As just one example, this Court highlights the implications of the revised definition for purposes of showing numerosity.

### 3.      Rule 23(a) – Numerosity

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Fourth Circuit has held that "[n]o specified number is needed to maintain a class action." *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (quoting *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967)). While it has approved classes with as few as 18 members, *see Cypress*, 375 F.2d at 653, it has stated, as a "general guideline," that "a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) ("*In re Zetia*") (quoting 1 *Newberg on Class Actions* § 3:12 (5th ed. 2021)). "[C]ases between twenty and forty [class] members" have been described as a "gray area." *Id.* Indeed, this District and the Fourth Circuit have articulated contradictory standards for application in such cases, with courts in this District having repeatedly stated that "[a] class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical," *CASA, Inc. v.*

*Trump*, 793 F. Supp. 3d 703, 718 (D. Md. 2025) (quoting *Yost v. Elon Prop. Mgmt. Co.-Lexford Pools 1/3, LLC*, No. ELH-21-1520, 2023 WL 185178, at *6 (D. Md. Jan. 13, 2023)) (collecting cases), while the Fourth Circuit appears to have endorsed the presumption that "classes with *fewer than thirty* members *do not* justify a class action." *Williams v. Henderson*, 129 F. App'x 806, 811 (4th Cir. 2005) (unpublished per curiam) (emphasis added) (quoting 7A Charles Alan Wright & Arthur R. Miller, *Fed. Practice and Procedure* § 1762 (2d ed. 1986)).[22]

    In briefing the issue of certification, Plaintiff put forward an altogether new class definition which would put the class in the hundreds. PNC, applying Plaintiff's original class definition— but based on what this Court has concluded to be an erroneous interpretation of the Fourth Circuit's holdings in this case—argued that the class contained only eight members, and thus was clearly insufficiently numerous for certification. This Court has now adopted a class definition which, while slightly modified from that which Plaintiff originally pleaded, retains the original definition's parameter that any class members must have had HELOC loan agreements with National City Bank. During and after discovery, PNC stated it had identified thirty such borrowers with National City HELOCs (the "National City Borrowers"). ECF 81-5 at 9; ECF 95 at 12 (citing ECF 95-2 (Francis Supp. Decl.) ¶ 4). At different points in his motion to certify, Plaintiff alternatively states that he "does not concede that [this number] is correct," ECF 83-1 at 12, but also that "Named Plaintiff alleges—and discovery shows and confirms PNC that [sic] there are at least 30 similarly situated persons whose common experiences relating [sic] to PNC's debt collection conduct." ECF 83-1 at 19 (citing ECF 81-5 at 9). However, while calling PNC's estimate "self-serving," ECF 83-1 at 19, and taking issue with the methodology by which PNC reached it,

---

[22] *See also* 1 *McLaughlin on Class Actions* § 4:5 (22nd ed. Nov. 2025 update) ("Courts will generally decline to certify classes comprising fewer than approximately 25 members absent extraordinary circumstances.").

Plaintiff has not—even as the party burdened with demonstrating the bases for certification—offered an alternative estimate of the number of National City Borrowers. Rather, Plaintiff simply asserts—with reference to only a single case (*Dameron v. Sinai Hosp. of Balt., Inc.*, 595 F. Supp. 1404, 1408 (D. Md. 1984)) in support[23]—that "even if the limited number identified through PNC's restricted method is correct," a class of thirty is presumptively sufficient to satisfy the numerosity requirement. *Id.* ("PNC's restricted number of 30 make[s] joinder of all in a single transaction appropriate.").

However, that potential class of thirty borrowers does not account for the new parameter that this Court has concluded must apply to the class—that it include only borrowers who were issued a credit card. In its opposition to certification, PNC has stated that, among the thirty National City Borrowers, four different versions of National City Bank's Equity Reserve Agreement were executed. ECF 95 at 14 (citing ECF 95-2 (Francis Supp. Decl.) ¶ 10). Among these four versions, PNC noted only "one material variation": twenty-one of the National City Borrowers executed an agreement (versions date June 2005 and January 2007) providing that National City "*will* issue" a credit card to the borrower, while the other nine National City Borrowers executed an agreement (versions dated May 2003 and July 2004) providing that National City "*may* issue" a credit card. ECF 95 at 14–15 (emphasis added) (citing ECF 95-2 (Francis Supp. Decl. ¶ 12)).[24] While PNC did

---

[23] This Court notes that while *Dameron* indeed suggested that a class of 25 to 30 members raises the presumption of impracticability of joinder, the quote that Plaintiff attributes to the *Dameron* court appears nowhere in that opinion, or in any opinion in Westlaw. In fact, the only document in Westlaw containing the exact language "quoted" by Plaintiff is a "Memorandum in Support of Motion for Class Certification" filed in a 2009 case in the Southern District of Florida. *See* 2009 WL 4726765 (S.D. Fla.).

[24] At multiple points in its opposition, PNC suggests that the class is restricted to those borrowers who "entered into the *same* Equity Reserve Agreement as Plaintiff." ECF 95 at 13 (emphasis added); *see also id.* at 14 ("PNC undertook efforts to see if it would be possible to determine how many of the 29 borrowers had entered into the *same* HELOC agreement as Plaintiff") (emphasis added); *id.* ("To determine whether each of the 29 borrowers executed the *same* agreement as

not submit any evidence of these versions or the "will"/"may" distinction beyond Ms. Francis's Supplemental Declaration, Plaintiff did not, in his Reply, dispute PNC's representations.

It is reasonable for this Court to infer, for purposes of ascertaining class size, that those twenty-one National City Borrowers whose agreements provided a credit card "will issue" were, indeed, issued a credit card. 1 *McLaughlin on Class Actions* § 4:5 (22nd ed. Nov. 2025 update) ("It is permissible . . . for the court to rely on reasonable inferences drawn from available facts to ascertain numerosity . . . ."). In addition, PNC has identified "two borrowers, one of whom is Plaintiff, [who] both actually used a credit card to access the HELOC credit and signed a HELOC agreement stating that National City 'may' issue a credit card." ECF 95 at 16 n.11 (citing ECF 95-2 (Francis Supp. Decl.) ¶ 17). This Court can reasonably conclude, then, that the class here consists of, at minimum, twenty-three members, and, at maximum, thirty. Thus, the class sits squarely within the "gray area" described by the Fourth Circuit, and, even at its maximum, would sit precisely at the number—thirty—for which this District and the Fourth Circuit have issued contradictory guidance.

The Fourth Circuit has stated that, where class sizes fall within this "gray area," "'all the circumstances of the case should be taken into consideration' in evaluating the impracticability of joinder." *In re Zetia*, 7 F.4th at 234 (quoting *Ballard v. Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976)). *See also Santos v. E&R Servs., Inc.*, No. DLB-20-2737, 2021 WL 6073039, at *8 (D. Md. Dec. 23, 2021) ("[W]hen a proposed class would have 20 to 39 members, the district court should consider 'all the circumstances of the case . . . in evaluating the impracticability of joinder.'") (quoting *In re Zetia* (internal quotation marks omitted)). "[P]racticality of joinder

---

Plaintiff . . . .") (emphasis added); *id.* at 19 ("Plaintiff now seeks to drop the requirement that class members signed the *same* National City HELOC agreement as Plaintiff . . . .") (emphasis added). Plaintiff's originally pleaded class definition did not contain this limiting parameter.

depends on several factors, including: (1) the size of the class, (2) ease of identifying and serving the members, (3) their geographical dispersion, and (4) whether individual claims are so small as to inhibit a class member from pursuing his own interest." *Calderon v. GEICO Gen. Ins. Co.*, 279 F.R.D. 337, 346 (D. Md. 2012) (quoting *Cuthie v. Fleet Rsrv. Ass'n*, 743 F. Supp.2d 486, 498 (D. Md. 2010) (citation omitted)). The Fourth Circuit has further emphasized that a numerosity analysis predicated on the impracticability of *individual suits* rather than the impracticability of *joinder* may constitute an abuse of discretion. *See In re Zetia*, 7 F.4th at 235–36.

This Court acknowledges that the parties' briefing of the various elements required for certification under Rule 23 has entailed some discussion of the factors listed in *Calderon* for the analysis of impracticability of joinder. However, with this Court having herein adopted a revised class definition which indicates to this Court a class size (between twenty-three and thirty members) not readily characterized as either sufficiently or insufficiently numerous, and with neither party apparently having contemplated such definition or meaningfully addressed such class size in their briefing, this Court thinks it would be improper to press on with the "particularly rigorous" inquiry into impracticability (and certification more generally) without additional briefing . *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 896 (3d Cir. 2022) (the "inquiry into impracticability should be particularly rigorous when the putative class consists of fewer than forty members.") This is particularly so where, as discussed above, Plaintiff has not shown actual damages, and thus, the viability of Plaintiff's claim depends on an award of class action statutory damages under TILA, which necessarily depends on this Court certifying the class.

Therefore, this Court requests additional briefing from the parties regarding (1) the impact of its rulings on Plaintiff's grounds for standing and individual damages on his motion to certify, and (2) the bases for class certification, including impracticability of joinder, in light of the class

definition adopted herein by this Court. This Court will hold the motion to certify in abeyance until such briefing is submitted.[25] It emphasizes, however, that the burden remains with Plaintiff, as the party seeking certification, to sufficiently demonstrate numerosity. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) ("[W]e have stressed in case after case that it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but that it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23.") (emphasis in original); *Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 404 (D. Md. 2023) ("[T]he burden is on the plaintiffs to show that other class members exist and that their joinder is impracticable; a court may not rely on mere speculation that numerosity has been satisfied.") (citing *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356–57 (3d Cir. 2013); *Poindexter v. Teubert*, 462 F.2d 1096, 1097 (4th Cir. 1972)).

## III.    CONCLUSION

For the reasons stated above, PNC's Motion to Dismiss, or in the Alternative, for Summary Judgment, ECF 80, will be granted in part and denied in part. Judgment will be entered in favor of PNC on the issue of Plaintiff's individual damages. Plaintiff's Motion for Class Certification, ECF 83, and his Cross-Motion for Partial Summary Judgment, ECF 86, will be held in abeyance pending the submission of the supplemental briefing described herein. The parties are to submit this supplemental briefing by Wednesday, February 25, 2026.

Dated: February 2, 2026                                          _____/s/_____
                                                                 Stephanie A. Gallagher
                                                                 United States District Judge

---

[25] This Court will also hold Plaintiff's Cross-motion for Partial Summary Judgment in abeyance until after it reaches a decision regarding class certification.